**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| FRESENIUS MANAGEMENT SERVICES, INC. <br><br><br> Plaintiff, <br><br> v. <br><br><br> MICHELLE CARVER, <br><br><br> Defendant. | CIVIL ACTION NO. _____ |

**COMPLAINT FOR EQUITABLE RELIEF AND DAMAGES**
**AND JURY DEMAND**

Plaintiff Fresenius Management Services, Inc. ("Plaintiff") by and through its attorneys, for its Complaint for Equitable Relief and Damages against Defendant Michelle Carver ("Defendant" or "Carver"), alleges as follows upon personal knowledge as to its own acts and upon information and belief as to all other matters:

**INTRODUCTION AND NATURE OF THE ACTION**

1.      This action arises out of Carver's breach of multiple post-employment obligations set forth in a series of agreements she signed in exchange for participating in long term incentive plans – all entitled, Employee Confidentiality, Assignment and Protective Covenants Agreement (each an "Agreement") and dated December 8, 2020, August 3, 2021, August 15, 2022, August 4, 2023, July 28, 2024, and July 29, 2025.  Copies of the Agreements are attached as Exhibits A through F (in chronological order).  Most recently, Carver was employed as the Senior Vice

President, Nursing and Clinical Services, Chief Nursing Officer for Fresenius Kidney Care.[1]  In this role, Carver was an executive leader responsible for setting the strategic vision, clinical standards, and operational excellence of nursing and patient care across Fresenius Kidney Care's dialysis network.  The role was a top-level position reporting to the President of Fresenius Kidney Care.  Carver had access to, created, and used highly sensitive information of Fresenius Medical Care and its affiliated entities, including Plaintiff (collectively, "FME").  Carver was the co-author of the clinical strategy of Fresenius Kidney Care, which operates in the United States.  Further, Carver was the operational conduit for the Fresenius Kidney Care medical office, overseeing clinical workflow for nurses, patient care technicians and other members of the patient care team.  In short, she was the architect and visionary on the clinical operations of FME's dialysis clinics within the United States.

Carver resigned effective April 30, 2026, and Plaintiff has come to understand that Carver has accepted a senior executive position with FME's direct competitor, U.S. Renal Care, Inc. or its affiliated entity ("USRC").  Indeed, Plaintiff has reason to believe that Carver took days off from work at Plaintiff during the week of April 20 to attend a leadership meeting with high-level executives at USRC.

Carver's employment by USRC unequivocally violates the express terms of the post-employment protective covenants in the Agreements she entered into in connection with her employment with Plaintiff.  Carver's competitive activities are improper competition, and the harm to Plaintiff is immediate and irreparable.  Carver's actions severely imperil FME's trade secrets

---

[1]   Plaintiff Fresenius Management Services, Inc. provides administrative support to the dialysis services business of FME in the United States, which operates under the trade name Fresenius Kidney Care.

and confidential information, as it is inevitable that she would disclose such information to her new employer, USRC, and they further imperil FME's goodwill.

## PARTIES

1. Plaintiff is a corporation organized under the laws of the State of Delaware with its principal place of business at 920 Winter Street, Waltham, Massachusetts.

2. Defendant is an individual who, upon information and belief, resides in Pickrell, Nebraska.

## JURISDICTION AND VENUE

3. Subject matter jurisdiction exists pursuant to 28 U.S.C. § 1332(a) because there exists complete diversity between the parties and the amount in controversy exceeds $75,000.

4. Personal jurisdiction exists over Carver under M.G.L. c. 223A §§ 1 and 3 because Carver expressly agreed that the Agreements shall be governed by Massachusetts law, and she submitted to the exclusive jurisdiction of the United States District Court for the District of Massachusetts. (Agreements §§ 7 and 8). Further, Carver transacted business in the Commonwealth of Massachusetts, including but not limited to being employed by Plaintiff, a Massachusetts entity, executing the Agreements with Plaintiff, and visiting corporate headquarters and transacting business in Waltham, Massachusetts.

5. Venue is proper pursuant to 28 U.S.C. § 1391. The Agreements provide that the parties submit to the exclusive jurisdiction of the United States District Court for the District of Massachusetts, and Carver waived any objection to the laying of venue in this Court. (Agreements § 8).

**<u>FACTUAL ALLEGATIONS</u>**

*Fresenius Medical Care's Business*

6.    Fresenius Medical Care and its global affiliates are the world's leading provider of products and services for people with chronic kidney failure.  Around 4.5 million patients with this disease worldwide regularly undergo dialysis treatment.  Dialysis is a vital blood cleansing procedure that substitutes the function of the kidney in case of kidney failure.

7.    Fresenius Kidney Care ("<u>FKC</u>"), a division of FME, is a leader in dialysis care in the United States, treating approximately 205,000 patients in over 2,600 clinics throughout the country.  Treatment options include at-home peritoneal dialysis, at-home hemodialysis, and in-center hemodialysis.  FKC also provides home delivery for equipment and supplies, and patient travel services.  FKC provides clinical care, patient education, nutritional counseling and social work services.

8.    In addition to asking employees to sign agreements which contain covenants that protect trade secrets and confidential information and require the return of property upon termination, Plaintiff takes the following measures to protect its trade secrets and confidential information: (a) prohibiting the use of FME materials for purposes not directly related to its business, or the removal or borrowing of its property without permission; (b) using badge IDs to restrict access to and within its facilities; (c) prohibiting the use of its computer systems for noncompany purposes; (d) restricting access to its computerized information through the use of passwords; and (e) restricting access to its computerized company information based on each individual employee's "need to know" the particular information.

*Carver's Employment*

9.      Carver first became employed by Plaintiff when FME acquired NxStage Medical, Inc. in 2019.  Carver held positions at the director and vice president level with FME during her employment, all within the clinical operations department and/or groups.

10.      Most recently, effective June 25, 2023, Carver was promoted to the position of Senior Vice President Nursing and Clinical Services, Chief Nursing Officer for FKC.  This is the position Carver held until her resignation from employment.

11.      Carver is a highly paid executive of FKC.  In 2025, Carver's IRS Form W-2 reflects that she was paid wages and bonuses in the amount of $495,092.09 from Plaintiff.

12.      Plaintiff and Carver entered into a Retention Agreement dated December 6, 2024, whereby Carver received a retention bonus in the amount of $185,000, payable on the first regular payroll date following January 31, 2026.  Plaintiff made the retention bonus payment to Carver, as contracted.

13.      In her paycheck dated March 20, 2026, Plaintiff paid Carver a discretionary bonus from a program for senior executives (the Global Bonus Plan) in the amount of $198,425.43.

14.      From January 1, 2026, through April 17, 2026, Carver was paid $501,356.45 in wages and bonuses from Plaintiff.

15.      In her role as Senior Vice President, Nursing and Clinical Services, Chief Nursing Officer, Carver was the executive leader responsible for setting the strategic vision, clinical standards, and operational excellence of nursing and patient care services across the FKC's dialysis network.  This role ensures the highest quality of care, regulatory compliance and innovation in clinical practice while fostering a culture of compassion, safety, and continuous improvement.

16.     Among her principal duties and responsibilities, Carver provided, developed, and implemented strategic plans for nursing and patient care services that align with the organization's mission, vision, and goals; functioned as executive leadership for patient care services, including overseeing clinical staff practice standards, developing models for care delivery, and ensuring adherence to regulatory standards and policies; served as a key member of the executive leadership team, advising on clinical operations, patient outcomes, and workforce development; established and maintained evidence-based clinical protocols, policies, and quality standards for dialysis care; and oversaw patient safety initiatives and quality improvement.  Carver drove the adoption of new technologies, care models, and best practices in dialysis and chronic kidney disease management and oversaw all budgetary planning and fiscal responsibility for the nursing and clinical services groups.

17.     In 2024, Carver reported to Craig Cordola, Chief Executive Officer of FME's Care Delivery business and a member of FME's Management Board.  Starting in or around August 2025, Carver began reporting to Cassie McLean, President FKC.

18.     Carver attended, participated and presented at executive meetings at which future business plans were discussed at the highest levels of the organization.  If known by a competitor, such confidential information, trade secrets and future business plans would provide the competitor with an unfair advantage.

19.     For example, and without limitation, Carver was involved in the following executive level matters:

- MBRs – Monthly Management Board Review meetings involving  FME's Global CEO and CFO and at which executives discussed operational successes and challenges, among other topics.

- FME's Care Delivery Executive Counsel meetings at which executive discussed the future of FME's Care Delivery business, which includes FKC.

- Co-sponsoring FKC's analysis and roll out of "Binders in the Bundle," a significant change to the dialysis business model in the United States and one which Carver led FKC's strategic planning of the future of patient care, patient work flow and dialysis clinics generally.

20.   Carver was the lead on FKC's home dialysis strategies and understood where FKC was deploying its resources in the marketplace.

21.   Carver has intimate and non-public knowledge of the confidential algorithms and protocols used by FKC to treat patients in the clinics.

22.   Carver is intimately familiar with FKC's confidential business strategies regarding high-volume hemodiafiltrations ("HighVolumeHDF"), a dialysis treatment modality that is new to the United States and is presently being rolled out to FKC clinics.  While the fact that HighVolumeHDF treatments are being used by FKC is publicly known, Carver worked extensively on its roll out within the United States and is aware of the training, strategies, challenges and successes of FKC in this space that are not known by competitors and which provide FKC with a competitive advantage in the delivery of dialysis care in the United States.

23.   At the time of her resignation from employment, Carver was working on the 2027 clinical strategy for FKC.

24.   These are but a few examples of the types of information to which Carver was exposed and used in the performance of her executive-level duties.

25.   Upon information and belief, Carver continued to sit in on senior executive meetings and learn updated confidential information and trade secrets of FME, even after she had resigned but before she notified FME of her intent to join USRC.

*Carver's Post-Employment Obligations*

26.   In connection with her receipt of a series of awards under FME's long term incentive plan awards ("LTIP"), Carver executed and became bound by a series of Agreements

7

dated December 8, 2020, August 3, 2021, August 15, 2022, August 4, 2023, July 28, 2024, and July 29, 2025, true and accurate copies of which are attached hereto as Exhibits A through F.

27.     Carver received significant value through the LTIP awards.  For example, the Performance Share for the grant date July 31, 2023 was $145,000, the Performance Share for the grant dated July 29, 2024 was $200,000, and the Performance Share for the grant date July 28, 2025 was $225,000.

28.     Each of the Agreements explain that they do not supersede prior restrictive covenants and, therefore, each of the Agreements remain enforceable.  *See e.g.*, Agreement 7/29/25 (Exhibit F) at § 10 ("this Agreement is intended to be in addition to (and not replace) any other agreement(s) I have entered into which address(es) post-employment obligations, such as agreements concerning nondisclosure of Confidential Information or Trade Secrets, nonsolicitation, noncompetition and intellectual property…").

29.     In her Agreements, Carver agreed to various post-employment restrictive covenants.  As set forth in more detail in each of the Agreements, Carver agreed that during or after her employment, she would not use or disclose any confidential information of FME (Section 3(a)), and that she would return to FME all company property (including electronic information) in her possession upon the termination of her employment.  *See e.g.,* Agreement 7/29/25 (Exhibit F) at Section 3(c).

30.     In the Agreements, Carver agreed that for twelve (12) months following the termination of her employment, she would not  work for or in furtherance of any Competing Business within the Restricted Area in circumstances where her duties, services and/or responsibilities are the same as or substantially similar to any duties and responsibilities he performed for the Company during the Look Back Period.  *See* Agreement 8/15/22 (Exhibit C),

8

8/4/23 (Exhibit D), 7.28.24 (Exhibit E), and 7/29/25 (Exhibit F) at Section 5(b).  The capitalized terms are defined in the Agreement.

31.    In the Agreements dated 8/12/20 (Exhibit A) and 8/3/21 (Exhibit B), Carver agreed not to work for or in furtherance of any Competing Business within the Restricted Area, without regard to the scope of her duties as set out in the later Agreements referenced in the above paragraph.

32.    The "Restricted Area" is defined in the Agreements as "the territory or territories or other geographic areas in which the Company does business and as to which I provided services or had a material presence or influence, and/or about which I learned Confidential Information. Given my role with the Company, I agree that the Restricted Area may be defined for me to be the entire United States (including any territories of the United States)."  Exhibits A-D at Section 5(a)(vi) and Exhibits E-F at Section 5(a)(v).

33.    Through Sections 5(c)-(e) of the Agreements, Carver agreed not to solicit customers, patients, physicians, suppliers, vendors, and employees for a one (1) year period after the termination of her employment.  *See* Agreements dated 8/15/22 (Exhibit C), 8/4/23 (Exhibit D), 7/28/24 (Exhibit E) (customers, patients, physicians, and employees), and 7/29/25 (Exhibit F) (same). The restrictive period for non-solicitation in the Agreements dated 8/12/20 (Exhibit A) and 8/3/21 (Exhibit B) is twenty-four (24) months.

*Carver Resigns to Join USRC*

34.    On March 2, 2026, Carver emailed from her FME email address to her personal email address (michellern71@hotmail.com) a copy of her August 3, 2021 Agreement, her job description, and PowerPoint presentation slide containing the Nursing & Clinical Services

9

Organization, including the names of thirty (30) employees who report to her (directly or indirectly), those who report to them, and the corporate structure within her organization.

35.     On March 23, 2026 – the Monday immediately after receiving her Global Bonus Plan payment on Friday March 20, 2026 – Carver informed Ms. McLean that she (Carver) intended to resign with a proposed last date worked of April 10, 2026.  Carver informed Ms. McLean that she was resigning due to personal circumstances.

36.     On at least one more occasion thereafter, Carver told Ms. McLean and another senior leader that she (Carver) was resigning due to personal circumstances.

37.     At the time she submitted her resignation from employment or in the weeks that followed while she continued working out her notice period, Carver did not disclose she intended to join USRC. Carver only disclosed her plans to join USRC when specifically asked by Ms. McLean on April 27, 2026.  At that point, her access to FME systems was cut off.

38.     Because Ms. McLean did not know Carver intended to join USRC after Carver informed her of the resignation, Ms. McClean offered and Carver agreed that Carver's last day of employment would be April 30, 2026.

39.     Carver requested paid time off from work from April 22 through April 24, 2026.  Plaintiff granted the request but did not know why Carver needed the time off.

40.     Upon information and belief, Carver attended the USRC Clinical Leadership Conference on one or more of the days she requested off from Plaintiff.

41.     Upon information and belief, USRC intends to employ Carver within the Restricted Territory in violation of her obligations under the Agreements.

42.    Upon information and belief, Carver's duties, services and/or responsibilities at USRC are such that she is likely or probable to use or disclose Confidential Information in performing them.

43.    USRC is a direct competitor of Fresenius Medical Care, FKC and Plaintiff.

44.    USRC is a "Competing Business" within the meaning of the Agreements.

45.    USRC partners with physicians across the United States to operate outpatient, home and specialty dialysis programs to serve people living with chronic and acute renal disease.  Upon information and belief, USRC serves approximately 37,000 patients through over 200 home programs and over 500 dialysis facilities across 32 states.  *See* https://www.usrenalcare.com/about/ (last accessed April 27, 2026).

46.    At the time of her resignation from employment, Carver knew that USRC was a competitor.

47.    USRC has a history of recruiting and attempting to employ FME employees in violation of their restrictive covenants.  USRC's strategy for poaching FME employees and ignoring contractual commitments made by the employees is known in the industry.

48.    Permitting Carver to be employed by, and continue her employment with, USRC would give USRC an unfair competitive advantage in as much as it is inevitable that Carver will, in the performance of her duties for USRC, use and disclose trade secrets and confidential information and harm its goodwill.

**COUNT ONE**
**BREACH OF CONTRACTS**

49.    Plaintiff repeats and re-alleges all of the allegations contained in the foregoing paragraphs as if fully set forth herein.

11

50. There exists six (6) valid and binding Agreements between Plaintiff and Carver, as attached as Exhibits A through F.

51. Each Agreement was made for valid consideration.

52. Each Agreement is reasonable, consonant with public policy, and is necessary to protect the legitimate business interests of Plaintiff and FME.

53. Each Agreement is reasonably limited in scope and narrowly tailored to protect Plaintiff's and FME legitimate business interests.

54. Plaintiff and FME have a clearly ascertainable right to protect its goodwill, confidential business information and trade secrets and to enforce the Agreements' restrictive covenants.

55. Carver breached and/or will breach her contractual obligations by providing services to and on behalf of USRC and by virtue of the nature of her employment with USRC.

56. Plaintiff will suffer, and continue to suffer, irreparable harm as a result of this breach, and threatened breach. Plaintiff is threatened with losing the value of its trade secrets and confidential information and certain goodwill.

### REQUESTS FOR RELIEF

**WHEREFORE,** Plaintiff requests that this Court:

1. Enter an order that Carver and all parties in active concert or participation with her be preliminarily and permanently enjoined from (a) performing services for USRC anywhere in the United States for one (1) year following the termination of her employment at Plaintiff, (b) disclosing or using any trade secrets, confidential information, or proprietary information in violation of the Agreements and applicable law (c) destroying, discarding or altering, directly or indirectly, any FME's information or property, and (d) otherwise engaging in any conduct which violates the Agreement.

2.      Enter an order that Carver and all parties in active concert or participation with her be preliminarily and permanently enjoined for twenty four (24) months or twelve (12) months following  termination from employment at Plaintiff from (a) soliciting or communicating with a Covered Customer, Patient or Physician for the purpose of (i) selling or providing the Covered Customer, Patient or Physician a Competing Product or Service, or (ii) inducing or encouraging the Covered Customer, Patient or Physician to end, or change to FME's detriment the customer's, patient's or physician's relationship with the Company; (b) soliciting or communicating with a Covered Supplier or Vendor for the purpose of inducing or encouraging the Covered Supplier or Vendor to end or change to FME's detriment the supplier's or vendor's relationship with the Company; (c) soliciting or communicating with an employee of FME for the purpose of inducing or encouraging the employee to leave the employment or to change an existing business relationship to the detriment of FME; and (d) helping another person or entity hire away a FME employee (as all capitalized terms are defined in the Agreements).

3.      Enter an order that Carver and all parties in active concert or participation with her be required to return to Plaintiff all originals and all copies of FME's trade secrets, confidential information, proprietary information, or other property that may exist, in any form, that are in her possession, custody or control.

4.      Enter an order that Carver and all parties in active concert or participation with her be required to explain any use or disclosure of trade secrets, confidential information, or proprietary information, in sufficient detail to enable Plaintiff to track down and recover all misappropriated information.

5.      Award Plaintiff its reasonable attorney's fees and costs incurred in successfully enforcing the Agreements, as set forth in Section 6 of the Agreement.

6.      Award Plaintiff damages in an amount to be determined at trial.

7.      Any such other and further relief that the Court deems fit and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury on all claims raised in its Complaint that are so triable.

Respectfully submitted,

FRESENIUS MANAGEMENT
SERVICES, INC.

By its attorneys,

*/s/ Jeffrey S. Siegel*
Jeffrey S. Siegel (BBO #647148)
Robert Papandrea (BBO #711504)
MORGAN, BROWN & JOY, LLP
28 State Street, 16th Floor
Boston, MA 02109
(617) 523-6666
(617) 367-3125 (fax)
jsiegel@morganbrown.com
rpapandrea@morganbrown.com

Dated: April 27, 2026